DUKE LABORATORIES, INC., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 9332.

United States District Court
D. Connecticut.

July 1, 1963.

Walter Maguire, John N. Cole and Peter Bentley, of Maguire, Cole & Bentley, Stamford, Conn., for plaintiff.

Herman Wilson and John Hammerman, Attys., Tax Div., Dept. of Justice, Washington, D. C., and Robert C. Zampano, U. S. Atty., New Haven, Conn., for defendant.

TIMBERS, District Judge.

Defendant has made a timely motion, pursuant to Rule 50(b), Fed.R.Civ.P., to set aside the jury verdict in the form of answers to special questions and the judgment in favor of plaintiff entered thereon; for entry of judgment in favor of defendant in accordance with defendant's motion for a directed verdict; or, in the alternative, for a new trial.

Plaintiff brought this action, pursuant to 28 U.S.C. § 1346(a) (1), to recover $478,040.71 of accumulated earnings taxes claimed to have been erroneously assessed and collected for the years 1956, 1957, 1958 and 1959.

After an eight day trial, the jury returned a verdict [1] in the form of answers to special questions, attached hereto as an Appendix. The jury found for each of the four years involved (i) that plaintiff had permitted its earnings or profits to accumulate beyond the reasonable needs of its business, but (ii) that plaintiff had not made such accumulations for the purpose of avoiding the surtax on plaintiff's stockholders.

Pursuant to a stipulation entered into between counsel, prior to submission of the case to the jury, for the entry of judgment depending upon the jury's answers to the special questions submitted, a judgment has been entered in favor of plaintiff in amount of $475,133.35 plus interest thereon according to law.[2]

Defendant's motion raises issues with respect to the correctness of the Court's denial of defendant's motion for a directed verdict; the sufficiency of the evidence to support the jury's answers to the second special question; and the correctness of the Court's charge to the jury on the second special question. Specifically, with respect to the charge, defendant claims "that the jury was improperly instructed that the proscribed

1. Defendant claimed the case for jury trial.

2. 28 U.S.C. § 2411(a) (1958).

purpose must be the purpose of the accumulations." [3]

■ The Court denies defendant's motion. An order has been entered accordingly.

The reasons for denying the motion are reflected in the annotations to the charge hereinafter set forth, it being the belief of the Court that the portions of the charge challenged by defendant can best be evaluated in the context of the charge as a whole and in the light of the authorities upon which the Court relied.

The Court's charge to the jury, annotated to indicate the authorities relied upon, was as follows.[4]

# COURT'S CHARGE TO THE JURY

## I

### FUNCTION OF COURT AND JURY

THE COURT: Ladies and gentlemen, we have now reached the point in this trial when it becomes our joint function —the function of the jury and the function of the Court—to perform our respective duties. It is the function of the Court to instruct you to the best of its ability with respect to the law applicable to this case. You members of the jury are the sole and exclusive judges of the facts. You will apply the law, which the Court gives you, to the facts as you find them. You then will render a verdict by a unanimous vote.

## II

### NATURE OF CASE

In this action, plaintiff Duke Laboratories, Incorporated—from this point on I will refer to it as the plaintiff—is suing to recover accumulated earnings taxes paid under protest to the United States Government—hereafter referred to as the defendant—for the tax years, which are also the calendar years in this instance, 1956, 1957, 1958 and 1959.

The case arose as follows: Plaintiff paid the regular corporate income tax upon its earnings in the four tax years involved at the maximum rate of fifty-two per cent. Defendant caused an audit to be made of plaintiff's tax returns for these four years, which was the defendant's right, to audit the returns. As a result of the audit, defendant determined that plaintiff had allowed its earnings during these four years to accumulate beyond the reasonable needs of its business. Defendant accordingly assessed the accumulated earnings tax provided by the statute. This resulted in the assessment of taxes and interest, in addition to the regular corporate income tax theretofore paid, against plaintiff in the following amounts for the four years in question. These are the four amounts applicable to each of the tax years involved, not with interest. These are the amounts of principal tax claimed to be due, accumulated earnings tax claimed by the Government to be due from the plaintiff:

1956 — $129,021.56.
1957 — $125,257.35.
1958 — $104,877.71.
1959 — $118,884.09.

These amounts, totaling, if my arithmetic is correct, $478,040.71, were paid by plaintiff under protest. Plaintiff has brought this action, as provided by law, to recover this amount, plus interest.

The regular corporate income tax which plaintiff paid upon its earnings at the maximum rate of fifty-two per cent for each of the tax years involved, is not involved in this action. What is involved, and the only tax that is involved, is an additional tax known as the accumulated earnings tax, which was assessed because defendant claimed that profits or earnings of plaintiff were accumulated instead of being distributed as dividends to the stockholders, for each of the tax years involved, and the defendant claims that this was done for the purpose of avoiding the income tax of the share-

---

3. But see the portion of the charge referred to, infra p. 414.

4. The charge as given to the jury of course did not include the annotations.

holders on these dividends, had they been declared.

I might say parenthetically, that not only is the jury not concerned in any way with the regular corporate income tax of Duke Laboratories, which has been paid for the four years involved, reflected in tax returns which are in evidence, but the jury also is in no way concerned with whether or not the tax of Mr. Herzog individually for those years has been paid. In fact, it is undisputed, and the record is clear that his returns were filed in time, and his taxes were paid in full. You are in no way concerned with either the personal income tax of Mr. Herzog for that period of those four years, or with the regular corporate income tax of the plaintiff corporation.

This action is brought against the United States because the taxes sought to be recovered were paid by the taxpayer—that is, by the corporation—to the Treasury Department, an agency of the United States. The plaintiff as a private corporation is a taxpayer. In bringing this suit for a refund, the plaintiff is exercising its right as a taxpayer. The fact that the plaintiff is a corporation, and that the defendant is the United States, makes no difference whatsoever in this action. It is simply a civil action between two parties, as I have indicated. Those two parties, the plaintiff, Duke Laboratories, and the defendant, the United States, are equal before the law. Each should be given the same fair and equal treatment by you.

Before taking up the statute which we have here involved and a rather detailed analysis for you ladies and gentlemen of the principles of law which you should apply in answering the two basic questions which will be submitted to you and which are substantially the two that I mentioned to you at the outset of this trial—before getting to those matters, which I think Mr. Wilson quite correctly characterized yesterday in his argument

to you as the tax law part of the case—I am going to take up first what Mr. Wilson characterized as the non-tax law aspects of the case. That is, the general rules of evidence which govern. First a brief statement of what the evidence is, what it consists of here, the matter of burden of proof, to what extent you may take into account circumstantial evidence, and how you go about determining issues of credibility. I am going to take up those matters and then I will follow that with instructions to you as to the applicable statute and the rules of law which govern, which I hope will help you in reaching a verdict.

### III

### WHAT CONSTITUTES EVIDENCE [5]

What is evidence? The evidence in the case consists first of the sworn testimony of the witnesses. I believe there were four witnesses on the stand: Dr. Herzog; Mr. North; Mr. Hesse, the bookkeeper of Duke Laboratories, who was made available to identify books; and Mr. Logan, who, I believe, was the Internal Revenue Service agent yesterday. They were the four witnesses who testified. The evidence also includes any depositions or portions of depositions which were read to you or in any way used by counsel on either side. The evidence includes all exhibits, all of which will be with you in the jury room when you begin your deliberations; that is, all exhibits which have been received as full exhibits in evidence. Plus any stipulations of fact which have been entered into between the lawyers in your presence, and which have been brought to your attention.

Any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the Court, must be entirely disregarded by you.

Statements and arguments of counsel are not evidence in the case, unless made as an admission or stipulation of fact.

---

5. Hogan v. New York Times Company, 211 F.Supp. 99, 118 (D.Conn.1962), aff'd, 313 F.2d 354, 355, 357 (2 Cir. 1963).

## IV

## BURDEN OF PROOF
## AND
## PREPONDERANCE OF EVIDENCE [6]

■ In this case the burden of proof on all issues is on the plaintiff, that is, Duke Laboratories, Incorporated. And that burden of proof never shifts. It remains with the plaintiff throughout the case and throughout your deliberations until you reach a verdict. The burden in this civil case, as in any civil case, is on the plaintiff to establish each essential element of its case by a preponderance of the evidence. What do we mean by a preponderance of the evidence? To establish by a preponderance of the evidence means very simply to prove that something is more likely so than not so. In other words, a preponderance of evidence means such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in your minds the belief that what is sought to be proved is more likely true than not true. In effect, the question which you may well ask yourselves in this connection is: Does the evidence of the party with the burden of proof carry the greater weight in your mind?

Perhaps an illustration, which many of you have heard before, will aptly describe what is meant by the expression "a preponderance of the evidence," in a civil case. I stress the fact this is a civil case because a good many of you have served in criminal cases in this Court where the burden of proof is on the Government to prove each essential element of the case beyond a reasonable doubt. Here the burden of proof is not on the Government; it is on the plaintiff, the taxpayer, and the burden is simply to prove the case by a preponderance of the evidence, not beyond a reasonable doubt.

Just assume, if you will, an apothecary scale. As you evaluate the evidence in going over the entire case, you place on the plaintiff's side of the scale the credible or believable evidence that supports its position—that is, which commends itself to your belief.

With respect to the evidence that favors the defendant, you place that on the defendant's side of the scale, and you continue that process until you have concluded your consideration of the entire case.

You, of course, take into account the various exhibits that have been offered in evidence by both sides.

If, after considering all the evidence and the exhibits and the reasonable inferences to be drawn therefrom, if you then find that the plaintiff's side of the scale is weighted in its favor, no matter how slightly, then the plaintiff has sustained its burden of proof.

If, on the other hand, you find that the scales are in balance, that is, even, or in dead center, then the plaintiff has failed to sustain its burden of proof.

And, obviously, if you find the scales tilt in the defendant's favor, then clearly the plaintiff has failed to sustain its burden of proof.

## V

## CIRCUMSTANTIAL EVIDENCE

A word or two about circumstantial evidence. Evidence may be established not merely by proof of facts, attested to by witnesses or demonstrated by documents, which are in evidence, but evidence may also be established by inferences which follow with reasonable certainty from proven facts.

Thus, both direct and circumstantial evidence is permissible evidence. Each type should be treated equally.

In weighing the evidence, you must consider the defendant's evidence as well as the plaintiff's evidence. The defendant's evidence, both what is brought out on cross-examination of the plaintiff's witnesses and what the defendant itself has presented in the form of documents or testimony, must be weighed by you

along with all the facts admitted and the other evidence in the case, in determining whether or not the plaintiff has established its claims by a preponderance of the evidence.

In this connection, I must caution you that, while you may draw inferences from admitted facts, inferences may not be drawn from other inferences; or, put another way, inferences may not be piled one upon the other; nor may one presumption be superimposed upon another presumption in order to reach a factual conclusion.

Finally, you should be careful to avoid resorting to speculation, conjecture, or guesswork—under the guise of relying on circumstantial evidence—in order to determine critical facts in this case.

## VI

### CREDIBILITY OF WITNESSES [7]

■ As in any case, one of the most important functions of the jury in arriving at your determination of the facts, as judges of the facts, is to evaluate the credibility of witnesses. And that applies here with equal force.

Obviously, the plaintiff relies heavily upon the testimony of Dr. Herzog and the testimony of their expert, Mr. North; the Government in turn relies upon evidence that was brought out on cross-examination by Mr. Wilson of both Dr. Herzog and Mr. North.

Now, here are a few simple common sense rules which may aid you in evaluating the testimony of those witnesses. I do not mean to exclude Mr. Logan, but I think we all understand he simply authenticated and verified the facts that are on the charts, Government's exhibits that were put in evidence on the last day.

In weighing the evidence, you may use the tests you would ordinarily use in determining the truth of matters important to you in your everyday life. You may consider the demeanor of the witness on the stand; any interest which

the witness may have in the outcome of the case; any bias or prejudice for or against any party; the witness' opportunity to observe; any reason to remember or forget; the inherent probability of his story; its consistency or lack of consistency; and its corroboration or lack of corroboration with other credible evidence.

■ In this connection, you may also bear in mind that if you should find that any witness has deliberately testified falsely on any material point, you may take that into consideration in determining whether he has testified falsely on other points. Simply because you find, if you do, that a witness has not testified with respect to one fact accurately, it does not necessarily follow that he is wrong on every other point. A witness may be honestly mistaken on one point of his testimony and may be entirely accurate on others. But if you find that a witness has deliberately lied on any material point, it is only natural that you should be suspicious of his testimony on all points; under those circumstances you are entitled to disbelieve his entire testimony. Whether you do disbelieve it or not lies in your own sound judgment.

■ In passing on the credibility of a witness, you may consider whether that witness has any bias or interest in the outcome of the case; and, if so, whether he has permitted that bias or interest to color his testimony. It does not follow simply from the fact that a witness does have a bias or an interest in the outcome of the case that his testimony is to be disbelieved. There are many people who, no matter what their interest in the outcome of the case may be, would not testify falsely. On the other hand, you should always bear in mind, that if a witness has a decided bias or interest in the outcome of the case, that may offer something of a temptation to shade his testimony in accordance with his bias, or sway him to advance his own interest. It may even be that his bias or interest has so operated on his mind that he has

7. Id. at 119.

come to believe what he wants to believe; he may, therefore, slant his testimony, or even testify falsely without consciously realizing it. If any witness whose credibility you are testing has some bias or some interest in the outcome of the case, that fact is one which you may take into consideration in weighing his testimony.

■ If you find that either party to this action has failed to call a witness under the control of that party, and that such witness, if called, would have been in a position to testify to a material fact in the case, then you may—but you are not required to—infer that the testimony of such witness, had he been called, would have been adverse to the party who had control over the witness but who failed to call him. Whether you draw such inference is entirely within your discretion.

The same principle is involved with respect to any document or documents which were not produced by either side. If you find there was such a document under the control of one side or the other, and that it would have contained material information had it been produced, you may—but you are not required to—draw an adverse interest against the party who failed to produce such a document.

## VII

### STATUTE

Coming now to the statutory provisions of the Internal Revenue Code of 1954, which control in this case, I am going to read them to you. The statute passed by Congress is the basis of this entire case. Everything that I say to you is by way of filling in the outline provided by the basic statute. The following provisions of the Internal Revenue Code of 1954 are here involved, and I charge you that this law controls:

" § 531.[8] In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income * * * of every corporation * * * an accumulated earnings tax * * *." I am omitting the various percentages and method of computing it. That is the basic statute involved. The next section:

" § 532.[9] The accumulated earnings tax * * * shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed. * * *"

" § 533.[10] * * * [T]he fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. * * *"

" § 537.[11] * * * [T]he term 'reasonable needs of the business' includes the reasonably anticipated needs of the business."

As I say, that is the crux of the case, the statutory basis for the case and the claims of the respective parties.

I shall now try to explain a little more fully how you go about applying that law to the facts of this case as you find them.

## VIII

### SPECIAL QUESTIONS TO BE ANSWERED

Stated in a nutshell, the ultimate issue in this case is whether the plaintiff is entitled to a refund of the accumulated earnings tax it paid under protest for the years 1956, 1957, 1958, and 1959.

■ In order to recover, the plaintiff must sustain the burden of proving by a

8. Int.Rev.Code of 1954, § 531, 26 U.S.C. § 531 (1958).

9. Int.Rev.Code of 1954, § 532, 26 U.S.C. § 532 (1958).

10. Int.Rev.Code of 1954, § 533, 26 U.S.C. § 533 (1958).

11. Int.Rev.Code of 1954, § 537, 26 U.S.C. § 537 (1958).

preponderance of the evidence two things. These are the two issues I mentioned on the first day of the trial. First, that the plaintiff's accumulations of earnings and profits during the tax years were not in excess of the reasonable needs of the business; secondly, even if they were, the plaintiff must prove that such accumulations were not for the purpose of preventing imposition of surtaxes on the plaintiff's shareholders.[12]

Your verdict upon the ultimate issue just stated depends upon your determination of the following two basic questions —questions which you will resolve by applying certain fundamental principles of law, which I am about to outline to you under each of these two questions.

Your deliberations as a jury in this case will result in your answering certain special questions, which I am going to submit to you in the form of this two-page document. These two basic questions simply reflect the two issues I have stated to you. So that you may wish to follow the balance of my charge in the light of what you are going to have to end up doing, I thought at this juncture I might just read to you the two questions you are going to answer. Then, depending upon your answers to these questions, the lawyers for both sides have stipulated that the verdict will be entered automatically through your foreman, and you will not have to stand up here and say, "We find for the defendant," or, "We find for the plaintiff," and if for the plaintiff in "X" dollars. That will be done by stipulation and will save you considerable time, if you should reach that point in the case.

In other words, you are going to decide this case by answering the critical questions, and from that point on, it is just a matter of mechanical arithmetic. If it is a plaintiff's verdict, then certain computations have to be made, including interest.

The first question you ladies and gentlemen will be called upon to answer is this:

"Did the plaintiff, Duke Laboratories, Incorporated, permit its earnings or profits to accumulate beyond the reasonable needs of its business?"

The first subdivision will be, "During 1956," and you will answer that yes or no; "During 1957," yes or no; the same for 1958 and 1959. You must answer each of those sub-questions either yes or no.

If your answers to those first four questions for any year or years is yes— in other words, if you find that there was an accumulation of earnings or profits by the plaintiff beyond its reasonable needs, then, and only in that event, do you go to the second question. Then, with respect to any year where you did find an unreasonable accumulation of earnings, you answer the following question, which is the second basic question, but with respect only to that year or those years as to which you answered the first question in the affirmative. The second question is this:

"Were such accumulations, if any, made for the purpose of avoiding the surtax upon the stockholders of Duke Laboratories, Incorporated?"

There, again, there are four specific sub-questions for each of the years involved, 1956, 1957, 1958, and 1959. You will answer that yes or no, depending, as I say, upon how you answered the first question with respect to each of those years.

## IX

### ESSENTIAL ISSUES OF CASE

**(1) Did Plaintiff Permit Its Earnings Or Profits To Accumulate Beyond The Reasonable Needs Of Its Business?**

Taking up the first question which you will take up in your deliberations in the

12. Trico Products Corp. v. McGowan, 67 F.Supp. 311, 313 (W.D.N.Y.1946), aff'd, 169 F.2d 343 (2 Cir. 1948), cert. denied, 335 U.S. 899, 69 S.Ct. 300, 93 L.Ed. 434 (1948). See Oyster Shell Products Corporation, Inc. v. Commissioner, 313 F.2d 449, 452–453 (2 Cir. 1963).

jury room, that is, "Did the plaintiff, during the tax years '56, '57, '58, and '59, permit its earnings or profits to accumulate beyond the reasonable needs of its business?" And from this point on, I am going to be addressing you on that question until I indicate we have gone to the second question. Everything I say from here on relates to this first basic question for you to answer.

The plaintiff has the burden of showing that the earnings or profits accumulated for each of the tax years in question were for the reasonable needs of its business.

■ An accumulation is beyond the reasonable needs of a business or the reasonable anticipated needs of a business if it exceeds the amount that a prudent business man would consider appropriate.[13]

■ To aid you in determining what were the reasonable anticipated needs of the business in which the plaintiff was engaged during the tax years in question, you should review the conduct of its affairs during the prior years.[14] You should consider the financial history and development of the corporation, and any special factors related to Duke Laboratories.[15] For example, as I recall, the witness North said in his opinion this was a unique company, unique in its position in the industry, in the fact that it handles two products, two general categories of products, which were the bandages and the cosmetics. All of that you should take into account. Relevant also is the past dividend policy of the corporation and the earnings or profits accumulated prior to the tax years 1956 through 1959,[16] which, depending upon your determination, may or may not have

been sufficient to meet the plaintiff's reasonable business needs during the tax years.[17]

■ While prior events in the corporation's development, as well as subsequent events, to the extent such events may throw light upon facts existing during the tax years, are relevant to the conditions of the plaintiff during the tax years, the question whether there has been an unreasonable accumulation of earnings is to be determined in the last analysis by conditions as they existed in the tax years involved.[18]

The business needs of a corporation are probably best expressed in terms of plans. At least, that is the term that has been used here. You have heard much evidence concerning the plaintiff's plans for the use of the earnings accumulated during the tax years 1956 through 1959. The matter of those plans of Duke Laboratories are not the only factors to be taken into account. There are other factors which I shall mention. I believe Mr. Cole, speaking for the plaintiff, and Mr. Wilson, speaking for the defendant, both indicated in their arguments to you yesterday that the evidence with respect to these plans of Duke Laboratories was critical and in many respects represents the crux of the case. In any event, these plans are among the critical factors for you to consider in determining whether the accumulations were beyond the reasonable needs of the business.

■ A plan for business purposes must be more than a nebulous desire to meet the problems or requirements of a business. In order to justify an accumulation as reasonable to meet a business need, the need must be treated with economic reality; mere recognition of the

13. Mobile Stove and Pulley Mfg. Co. v. United States, 62–2 U.S.Tax Cas. ¶ 9628 at 85,565 (S.D.Ala.1962).

14. Charleston Lumber Co. v. United States, 20 F.Supp. 83, 90 (S.D.W.Va.1937), appeal dismissed, 93 F.2d 1018 (4 Cir. 1937).

15. Industrial Bankers Securities Corp. v. Higgins, 104 F.2d 177, 182 (2 Cir. 1939).

16. World Pub. Co. v. United States, 72 F.Supp. 886, 894 (N.D.Okl.1947), aff'd, 169 F.2d 186 (10 Cir. 1948), cert. denied, 335 U.S. 911, 69 S.Ct. 480, 93 L.Ed. 443 (1949).

17. Treas.Reg. § 1.535–3(b) (ii) (1960).

18. Sterling Distributors, Inc. v. United States, 313 F.2d 803, 807 (5 Cir. 1963).

need is not enough.[19] In other words, mere recognition of a future problem with discussion of possible and alternative solutions is not sufficient under our law.[20] There must be substantial proof of a specific plan, objective or contingency, which, in the exercise of good business judgment, demanded the accumulation of the earnings and profits in a reasonable and reasonably definite amount.[21]

In addition to having a definite plan, the corporation must couple this plan with some action taken towards its consummation.[22] Remember these two simple terms; put perhaps as simply as possible, it will help, "definite plan coupled with some action." Justification for the accumulation of funds cannot be found merely in subsequently declared intentions.[23] The purpose, plan, or intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed objective.[24]

In short, in considering the plans referred to by Dr. Herzog during the course of his testimony, you should consider and ask yourselves in your deliberations whether those plans were definite and, if definite, whether they were coupled with some action directed toward their accomplishment.

As examples of action, action to be coupled with a definite plan, in the sense here used, you may consider, for example, evidence of expenditures incurred by the plaintiff to further these plans; you may consider evidence of correspondence and other communications, if there were any, between the plaintiff and others whose assistance was thought to be necessary to accomplish these plans. As further examples of action implementing the plans, or coupled with the plans, you may consider inspections made by Dr. Herzog of plants and other facilities in this country and abroad. These are merely illustrations of evidence you may consider in determining whether the plaintiff's plans were coupled with action.

I am not going to go into detail with respect to the evidence concerning these plans. You will recall there was considerable testimony, both on direct examination of Dr. Herzog and on cross-examination, with respect to the expansion of the Norwalk plant; the Paterson plant, the weaving plant; a pension plan; a solvent recovery plant; plans for advertising, professional advertising and direct consumer advertising; and plans to meet the competition presented by the development of the plastic bandage. There may very well have been others. I just mention these by way of illustration of what I referred to here as the plans of the corporation, about which there has been considerable testimony both on direct and cross of Dr. Herzog and Mr. North, and considerable argument by counsel.

What these plans were, and whether they met the tests of being specific, definite, feasible, whether they were coupled with action so as to justify accumulation of earnings and profits, are issues for you ladies and gentlemen to determine, based on all of the evidence.

The business need of a so-called plan must also be associated with the business at hand;[25] the mere possibility that the accumulation will be used at some indeterminate time in the future for a business purpose is not enough to make the accumulation reasonable. Depending on all the facts and circum-

19. Dixie, Inc. v. Commissioner, 277 F.2d 526, 528 (2 Cir. 1960), cert. denied, 364 U.S. 827, 81 S.Ct. 62, 5 L.Ed.2d 54 (1960).

20. Ibid.

21. Trico Products Corp. v. McGowan, supra note 12, at 320.

22. Dixie, Inc. v. Commissioner, supra note 19.

23. Smoot Sand & Gravel Corp. v. Commissioner, 241 F.2d 197, 202 (4 Cir. 1957), cert. denied, 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957).

24. Ibid.

25. McCutchin Drilling Co. v. Commissioner, 143 F.2d 480, 482 (5 Cir. 1944).

stances of the business, the need must be reasonably anticipated. Accumulation for unexpected demands of business or unanticipated emergencies are not accumulations for the reasonable needs of a corporation.[26] An unexpected demand, however, must be distinguished from a contingency, such as a reasonable business risk. A contingency may be a reasonable need for which a business may provide, if the likelihood—not merely the remote possibility—of its occurrence appears reasonable to a prudent business firm.[27]

An example of what I refer to, depending on how you find the facts which are solely within your province, of course, which you may wish to consider, is the evidence of the competition the plaintiff faced as a result of the development of the plastic bandage; it is for you to decide whether such competition constituted an unexpected demand or a contingency for which a reasonably prudent business should make provision.

■ Related to the plans of the plaintiff as described by Dr. Herzog, is the company policy of using its own resources for financing projects rather than borrowing money or issuing stock to the public. There is no requirement that a corporation must borrow or issue stock to the public to finance its business and growth. The existence of the plaintiff's policy not to borrow or issue shares to the public to finance its business and growth, but to do so through retained earnings, is within the law, and should be considered by you, among other factors, in determining whether the plaintiff accumulated earnings beyond the reasonable needs of its business. A corporation is not required by law to distribute all of its earnings, even though it may be able to borrow working capital for its present or foreseeable needs. The accumulation of working capital so as to

avoid borrowing must, of course, be a reasonable amount in relation to the plans and operations of the corporation in using the accumulated funds. In short, the corporation cannot accumulate working capital beyond the reasonable needs of the corporation.[28]

■ You have heard Dr. Herzog's testimony to the effect that the plans he was considering for the plaintiff were not recorded in the minutes of the board of directors, but were informally discussed by him, Dr. Herzog, and his two fellow directors, also officers and shareholders. This testimony, of course, may be considered by you in determining whether these plans had the required definiteness. But you should also take into account that formal entries in the company books are not the only way of substantiating reasonable business needs which may be established by other means.[29]

■ Nor is there a requirement that a corporation's plans be reduced to writing so long as testimony satisfactory to you establishes that the plans were specific, definite, and feasible, and coupled with some action aimed at their fulfillment.

In a nutshell, this is really just a matter of common sense. As the witness North said, and I think it is perfectly obvious to everybody in the courtroom, Duke Laboratories is a unique, peculiar business in the sense that it is a closely held small corporation, of which Dr. Herzog is the driving force. You should consider all of these factors which I am outlining to you, since these factors are spelled out in the law which I am bound to submit to you, and which you in turn are bound by your oath to follow. But the law, spelled out in the statute and decisions by the courts, necessarily must be considered and applied in the light of the peculiar facts and circumstances of

26. Motor Fuel Carriers, Inc. v. United States, 202 F.Supp. 497, 501 (N.D.Fla. 1962).

27. Smoot Sand & Gravel Corp. v. Commissioner, supra note 23, at 206.

28. Whitfield King Co. v. United States, 61-1 U.S.Tax Cas. ¶ 9300 (W.D.Tenn. 1961).

29. Smoot Sand & Gravel Corp. v. Commissioner, supra note 23.

a particular company involved, here Duke Laboratories, Incorporated.

■ In considering the reasonable business needs of the plaintiff for the tax years 1956 through 1959, you also should consider Dr. Herzog's testimony, he being a corporate officer and director, concerning the plans that were formulated. A corporation is entitled to exercise its own sound judgment about its business and its business needs, both present and reasonably anticipated in the future. The business judgment of those entrusted with the management of a successful and growing enterprise is not to be ignored.[30] But it is also not conclusive.[31] The ultimate determination of the reasonableness of accumulations is for you ladies and gentlemen.[32] The testimony of management, here by Dr. Herzog, is important; but it is just one of the many relevant factors for you to consider.

■ You should also consider the requirements of the plaintiff to keep funds on hand to meet the operating, or day-to-day, expenses of the corporation.[33] Such funds, of course, represent part of an accumulation and should be distinguished from funds accumulated to provide working capital for specific projects. The amount which may be set aside each year for operating expenses is really dependent upon the needs of the particular business.[34] Therefore, you should consider the particular needs of the plaintiff company for operating expenses in determining what was, if there was, a reasonable amount to be set aside for that purpose. For your guidance—but not binding upon you—an accepted rule of thumb is that the accumulation of funds to meet operating expenses of at least one year is reasonable.[35] I am referring here to funds to meet operating expenses as distinguished from funds necessary to meet the demands of special plans or projects, which has been the subject of much of the evidence here.

Another factor which you may consider when judging the reasonableness of the accumulation of funds by the plaintiff is the ratio of current assets to current liabilities.[36] Current assets are those which are in cash or assets which may be quickly converted into cash. Thus, under the law applicable in this Circuit and this Court, which you ladies and gentlemen must follow, you may exclude, in determining what were the current assets, the fixed assets and the accounts receivable of Duke Laboratories.[37] Current liabilities are those debts or obligations which will or may become due and payable in the near future. The really important question here is whether, in the light of the business needs of the corporation, it was reasonable to keep on hand the amounts of current assets shown by the evidence.

■ Although the reasonableness or unreasonableness of accumulations of earnings is to be determined by the conditions as they existed in the tax years in question, you may also, as I have mentioned briefly heretofore, consider subsequent events in so far as they shed light upon the conditions which existed during the tax years. Subsequent events, for instance, may be relevant as to the specificity, definiteness, and feasibility of plans claimed by the plaintiff to have been formulated prior to or during the tax years, and as to the implementation of those plans.[38] Hindsight,

30. Sterling Distributors, Inc. v. United States, supra note 18, at 807.

31. Trico Products Corp. v. McGowan, supra note 12, at 319.

32. Sterling Distributors, Inc. v. United States, supra note 18, at 807.

33. Id. at 808.

34. Dixie, Inc. v. Commissioner, supra note 19.

35. Sterling Distributors, Inc. v. United States, supra note 18, at 808.

36. Ibid.

37. Accounts receivable are not considered a quick asset. United Block Co. v. Helvering, 123 F.2d 704, 706 (2 Cir. 1941), cert. denied, United Block Co. v. C. I. R., 315 U.S. 812, 62 S.Ct. 797, 86 L.Ed. 1211 (1942).

38. Whitfield King Co. v. United States, supra note 28, at 79,759.

of course, may not determine the reasonableness of the corporation's accumulation during the tax years. A prudent business man, under the conditions present during the tax years, might consider accumulation of funds appropriate while subsequent events might prove his judgment to be wrong. A mistaken belief as to the necessity for accumulation of funds, if made in good faith, will not render that accumulation unreasonable.[39]

In summary, then, with respect to this first question for you ladies and gentlemen to decide, the question of whether the accumulation of funds by the plaintiff for the tax years 1956 through 1959 was for the reasonable needs of the business, is a question of fact to be determined by you ladies and gentlemen from all the evidence you have heard, and from all of the documents.

### (2) Were Plaintiff's Accumulations Of Earnings Or Profits Made For The Purpose Of Avoiding The Surtax On Plaintiff's Stockholders?

If your answer to this first question for any one or more of the years involved is that the accumulated funds were for reasonable needs of the business, then you answer this first question in the negative for such year or years. If you find that the accumulations were not reasonable for any one or more years, then and only in that event do you proceed to the second question. Assuming you get to the second question, and whether you get to it is entirely dependent upon how you find the facts with respect to the first basic question, but in the event you determine the first question with respect to any one or more years against the plaintiff, that is, in favor of the Government, then for that year or those years as to which you find there was an unreasonable accumulation of earnings, then you proceed to the second question, which is this:

"Were the unreasonable accumulations made to avoid the surtax upon the stockholders?"

■■■ If you find that the plaintiff's earnings were accumulated unreasonably, you must then determine whether that accumulation for the year or years involved was made with the intent to avoid the income tax with respect to shareholders. At this stage in your deliberations the statute which I read to you earlier, you will recall, raises a presumption that the purpose of any unreasonable accumulation, if you find there was such, was to avoid the income tax unless the corporation, by a preponderance of the evidence, shall prove to the contrary.[40] This presumption places the burden on the plaintiff, the corporation, to show by a preponderance of the evidence the absence of any intent to avoid the income tax with respect to its shareholders, regardless of whatever other purposes for accumulation the plaintiff may have established.[41] The intent to avoid the income tax with respect to shareholders need not be the sole or dominant intent in permitting the accumulations.[42] By way of illustration, whatever the motive may have been, when the practice of accumulation was adopted, an intent to avoid the income tax which induced or aided in inducing the continuance of that practice, is sufficient to impose the tax on the accumulated fund, that is, the accumulated income tax.[43]

■■■ In determining whether an unreasonable accumulation of funds was made with the prohibited purpose in mind, you may consider the amount of taxes which the shareholders would have had to pay if the accumulated funds had been distributed. Since Dr. Herzog ac-

---

39. Casey v. Commissioner, 267 F.2d 26, 32 (2 Cir. 1959) (concurring opinion).

40. Int.Rev.Code of 1954, § 533, 26 U.S.C. § 533 (1958).

41. Trico Products Corp. v. McGowan, supra note 12, at 323.

42. Ibid.

43. Ibid.

tively directed the corporation and stated that he knew that a distribution in the form of dividends would increase his income tax liability, you may attribute that knowledge on the part of Dr. Herzog to the plaintiff corporation.[44] I must caution you, however, that the mere fact that shareholders of a corporate taxpayer would have paid more taxes on their incomes if earnings and profits had been distributed, does not alone establish that the purpose of the unreasonable accumulation was to avoid the surtax.[45] It is simply one fact among all others to be taken into account and weighed in the scale.

If you answer the second question in the affirmative, with respect to any one or more of the tax years involved—that is, if you find that there were accumulations made for the purpose of avoiding the surtax upon the stockholders of Duke Laboratories—that will result in a judgment for the defendant, for the Government, as to such year or years; if you answer in the negative, a judgment for the plaintiff will follow for that year or years.

The amount of any judgment which may be entered as a result of your determination of these questions, as I said at the outset, will be handled by the Court as a matter of arithmetic, your job being simply to answer the two basic questions, broken down into the four years for each question.

# X

## EXPERT WITNESSES

I should say a word about the testimony of expert witnesses, since there has been such testimony in this case by Mr. North.

The rules of evidence ordinarily do not permit a witness to testify as to his opinions or conclusions. So-called expert witnesses, for example, in this case, Mr. North, on the subject he testified to, generally that of financial analysis, more particularly, his study of the cosmetics industry—such expert opinions are an exception to this rule.

 A witness who, by education and experience, has become an expert in any art, science, profession, or calling, may be permitted to state his opinion as to a matter in which he is versed, and which is material to the case, and may also state the reasons for such opinion. You should consider any expert opinion received in evidence in this case, and give it such weight as you think it deserves; and you are free to reject it entirely if you conclude that the reasons given in support of the opinion are unsound.

The jury is the sole and exclusive judge of the facts as to which there has been expert testimony in this case: just the same as with respect to any other facts.

Now, Mr. North did testify, if I recall correctly—and I caution you again that your recollection controls, not mine—but if I recall correctly, Mr. North did testify, I think towards the end of his direct examination, that, in his opinion, based on his experience and his analysis of the plaintiff's situation and including his study and analysis of the cosmetics industry, he testified that in his opinion the accumulations by Duke Laboratories were not at all unreasonable.

And if I further recall correctly, he said that that opinion—I think this was on cross-examination, although I am not sure—but I believe he stood on that conclusion that he believed, as a matter of opinion, that regardless of the so-called plans and projects of the company —in other words, he said just by looking at the liquid assets available, and the needs of the company, or operating needs, that he could justify the accumulations in each of the years involved, without reference to the so-called plans and projects.

Now, the reason I mention that is simply by way of an example of the care with which you must weigh, evaluate, and consider expert testimony.

---

44. Dixie, Inc. v. Commissioner, supra note 19.

45. R. Gsell & Co. v. Commissioner, 294 F.2d 321, 327 (2 Cir. 1961).

On the one hand, you have a witness who did state to you his qualifications, his experience, and I leave it to you as to what sort of an impression he formed in your minds. He testified with respect to his opinion as to a critical issue in the case. That opinion is not controverted. There is no contravening evidence or expert testimony to weigh against his.

So, in a sense, Mr. North's testimony, both with respect to that critical matter and others, is uncontroverted testimony. And you must be scrupulously careful in weighing that testimony, evaluating it, to bear in mind that neither Mr. North, in an expression of his opinion—nor Dr. Herzog, in his declaration that there was not an unreasonable accumulation, nor was there any intent on the part of the corporation to avoid surtax on shareholders—by the same token, anything that I say to you in my charge to you ladies and gentlemen—you should be scrupulously careful not to let any of those things supplant or substitute for your sole and exclusive function and duty as judges of the facts to determine what the facts are.

### CONCLUSION

In conclusion, ladies and gentlemen, take this case with you to the jury room. Determine the facts on the basis of the evidence, as you have heard it; apply the law as I have attempted to outline it to you; then render a verdict fairly, uprightly, and without a scintilla of prejudice.

When you reach your answers to these questions, you must be unanimous. In other words, all twelve jurors must agree before your answers to these special questions may be rendered. It is the duty of each juror to discuss and consider the opinions of the other jurors. Despite that, in the last analysis, it is your individual duty as an individual juror, to make up your own mind, and to decide this case upon the basis of your own individual judgment and conscience. You are answerable to no one but yourself, and your conscience, for your verdict in this case.

With that, the jury may retire to the jury room. Elect one of your number as foreman or forelady. Proceed to your consideration of the case. When you have reached your verdict in the form of answers to these special questions, inform the bailiff who will be outside of your room. Then return to the courtroom, and through your foreman or forelady announce your answers to these questions.

That concludes the charge, ladies and gentlemen. I have made arrangements for you to be taken to lunch at just about this time. I had guessed it might be about 12:30. I would suggest you go out to lunch now. You will be in the custody of the marshal from this point on, until you reach your verdict. You will not only be in the custody of the marshal, but you will be his guest for lunch.

I suggest that you do not actually begin your deliberations until you return to the courthouse. At that time the exhibits and the pleadings in the case will be delivered to you in the jury room. That will be the signal for you to start your deliberations. The reason I mention that detail is that, as many of you know, under the rules, I am required before the jury begins to deliberate, to entertain any objections from counsel to the Court's charge, and to consider any requests for further charge to the jury. When those matters have been heard by the Court and ruled on, the signal that you have a green light to proceed with your deliberations will be that the exhibits will be sent to the jury room, and I think by the time that you get back from lunch, they will be there.

Thank you very much. You may be excused.

(The jury was excused on Thursday, May 23, 1963 at 12:35 p. m.)

\* \* \*

May 23, 1963 at 5:00 P.M.

(The jury entered the courtroom.)

THE COURT: Good evening. You may be seated. I simply wanted to call you in, partly to give you a little recess because you have been at it now for two

and three-quarter hours, if my arithmetic is correct, but more to the point, I simply wanted to inquire, if I may, as to what the wishes of the jury are, not on the merits of the case—I am not calling you in for that purpose at all—but your wishes with respect to continued deliberations.

Let me say at the outset, I propose to follow whatever course you wish to follow. All I want to find out is what you want to do. Is there anything that the Court and our personnel here can do to accommodate you? It seems to me that there are perhaps three alternatives:

One, to continue deliberations as you have been for as long as you want, without recess;

The second alternative, you might like to recess and go to dinner, and then return and continue your deliberations until whatever time you choose to work tonight;

Or thirdly, you may, if you wish, be excused for the night and return in the morning and resume your deliberations at that time.

There may be another alternative that does not occur to me. At least, I can think of those three. All I would like to do is to accommodate you ladies and gentlemen, or a majority of you, if you can agree on how to proceed. Any way you wish to do it is entirely agreeable to the lawyers, to whom I have spoken about this before you came in, and myself.

I will be here as long as you wish to be. Would you prefer to go out and take a caucus and send a message in, and let me know how you want to proceed?

THE FOREMAN: May I make a statement, your Honor? The jury has not been in agreement as of yet. We are just compiling a request, your Honor, for interpretation of certain sections of your charge which might clarify the situation, and have it come to a fruition.

THE COURT: Would you suggest perhaps we just wait until you have been able to complete that question or interrogatory to the Court? And when you are ready, let us know and come back.

THE FOREMAN: We could be back in a few minutes, and send the question in.

THE COURT: It is our practice here to have such questions reduced to writing. They are usually written out by the foreman and signed by the foreman. I prefer to do it that way rather than by oral questions in the courtroom, for obvious reasons that I am sure the jurors understand. That gives me a chance to apprise counsel of the question or questions; and, secondly, have my response prepared to the question so there will not be any misunderstanding when the jury gets in.

So I think the best thing to do, if I may suggest it, is to write out whatever inquiries you have, and send them to me through the Marshal, and then I will call the twelve jurors in the courtroom and try to answer your query. The way you are going about it is just the right way.

I had neglected to tell you this morning, but I am sure most of you know, anyway, that you are entitled to have any portion of the charge re-read. You are entitled to have any portion of the record, the stenotype record, the transcript of the testimony, re-read.

We usually do not, except under the most unusual circumstances, give any further or additional charge than I have already given. To embark on any new statement is contrary to our practice. But I assume what you have in mind is the re-reading of a portion or portions of the instructions I gave you, and identify those the best you can.

I will try to respond.

We will stand in recess.

(A recess was taken.)

(In the absence of the jury, 6:27 p. m.:)

THE COURT: Gentlemen, it is now 6:27, and I have received the following message from the jury. It is in two parts. I will read the second part first:

"In a caucus of said jury, majority would like to recess until Friday morning for further deliberations and instructions as outlined in above request."

418

The above request reads as follows:

"Judge William Timbers:

"Your Honor, the jury for the case in question is not as yet in agreement. No. 1, a clarification of your Honor's charge in regard to Mr. North's testimony; No. 2, is the jury to consider as legal evidence, conversation Dr. Herzog had with others in regard to building and advertising plans schedules?"

That is the end of the message. It is signed Edward W. Blake, Foreman. I am glad they have given me overnight to think about it, and I will invite counsel's earnest attention to these two matters. I would not attempt to instruct the jury about them now. I will in the morning.

I am going to excuse them until 10:30 in the morning. I suggest I meet here with counsel at ten o'clock in the morning, and I will be glad to receive any views that the lawyers on either side wish to advance.

Having in mind what I said to the jury that, except under the most unusual circumstances, I prefer not to depart from the charge as given. I will try to locate the portions of the charge that they have asked for. I think particularly as to the second inquiry some slight amplification may be necessary.

MR. BENTLEY: Would you be kind enough to read the second question?

THE COURT: I will read the two questions they have put.

"No. 1. A clarification of your Honor's charge in regard to Mr. North's testimony; No. 2, is the jury to consider as legal evidence, conversation"—I do not know whether that is "conversation" or "conversations"—"Dr. Herzog had with others in regard to building and advertising plans schedules?"

Now, among other things, I think counsel ought to go over their notes or the transcript, and flag the evidence with respect to that latter matter. As I recall in the charge, I simply made a

passing reference to such conversations or communications Dr. Herzog had, as an example of what they might, if they chose to do so, find to be action coupled with a plan. I do not recall in the charge if I went into it in any more detail than that.

However, I think this jury should be excused because they want to go home.

Bring them in. I will hear counsel at ten o'clock in the morning on what my proposed response to the questions should be.

(The jury entered the courtroom at 6:28 p. m.)

THE COURT: Good evening again, ladies and gentlemen. I am going to grant your second request first, the request that you be permitted to resume in the morning, which I think probably is sensible under all the circumstances. Maybe I can speak louder in the morning, too. Then I will do my best to respond in a way that will be helpful to you, to the two specific inquiries you have made. I will do that in the morning. It will give me a little more time to get a portion of the charge transcribed. I think Mr. Gale will have to do that.

What time would be convenient for you ladies and gentlemen to resume in the morning? Would the usual time of 10:30 be all right?

How many would prefer to come at 10:00? The 10:00 o'clocks win out. That will be fine. I will give you your instructions at ten o'clock, and you should be back and able to resume your deliberations by 10:30, and you can take as long as you wish.

Let me just say this: What goes on in the jury room, of course, is your business and your business alone. Do not disclose to a soul outside of your own group of twelve, what has gone on in the jury room. I am not concerned, and counsel are not concerned, as to any dis-

agreement or division within your number. It is perfectly normal.

I hope eventually that you will be able to agree. But the important thing is, do not go out tonight and talk to anybody about this. It could upset all the work and investment of time that all of you, and all of us, have had in the case.

Go home and have a good night's sleep. Have your dinner and come back refreshed in the morning. I will do my best to help you out with these questions that you have put. I think maybe with a fresh start, we can make some progress. Three or four hours of deliberations up to this point in a case of this sort is not unreasonable, by any means.

On the contrary, it reflects or confirms what I had suspected from the outset, that we have a very intelligent jury here, and I do not think I would be letting any secrets out of school if I were to say to you what I said to counsel in your absence, on one occasion during this trial: That I think this case is being tried before just as intelligent a jury as can be obtained in any United States District Court in the country.

I think I know some of you people pretty well, having seen you here during the past few months. I am not trying to butter anybody up for anything. But do not be disturbed if any of you feel there has been any tension or any argument in the jury room.

I would simply say that it is for the good. It is a healthy situation. I much rather see you take your time, and be sure of your results, than to come to a hasty decision.

In any event, have a pleasant evening. I will see you in the morning at ten o'clock. Thank you very much.

(Whereupon, Court was adjourned at 6:40 p. m., until Friday, May 24, 1963, at 10:00 a. m.)

\* \* \*

# FIRST SUPPLEMENTAL CHARGE
## May 24, 1963 at 10:00 a.m.

(In the presence of the jury)

THE COURT: Good morning, ladies and gentlemen. I trust you all had a restful evening and are refreshed and ready to go to work again this morning.

I have taken up with the lawyers, as I told you I would, the two questions that the jury submitted last night, just before you recessed, and particularly I have informed the counsel as to how I propose to answer these questions. I will proceed to do so as follows:

### (1) Expert Testimony

The first question that was submitted through Mr. Blake, your foreman, reads as follows:

"No. 1, a clarification of your Honor's charge in regard to Mr. North's testimony."

Now, the first thing I am going to do in attempting to comply with the jury's inquiry in that respect is to read to you a short extract from the charge which Mr. Gale has prepared word for word as it was given, and I think with a few additional comments by me at the end, I hope this will comply with the jury's inquiry.

I charged you yesterday, and I reaffirm the charge in this respect as follows, on the subject of expert testimony.

"I should say a word about the testimony of expert witnesses since there has been such testimony in this case by Mr. North.

"The rules of evidence ordinarily do not permit a witness to testify as to his opinions or conclusions. So-called expert witnesses, for example, in this case, Mr. North, on the subjects he testified to, generally that of financial analysis, more particularly his study of the cosmetics industry—such expert opinions are an exception to this rule.

"A witness who by education and experience has become an expert in any art,

science, profession, or calling, may be permitted to state his opinion as to a matter in which he is versed and which is material to the case, and may also state the reasons for such opinion. You should consider any expert opinion received in evidence in this case, and give it such weight as you think it deserves; and you are free to reject it entirely if you conclude that the reasons given in support of the opinion are unsound.

"The jury is the sole and exclusive judges of the facts as to which there has been expert testimony in this case: just the same as with respect to any other facts.

"Now, Mr. North did testify, if I recall correctly, and I caution you again that your recollection controls, and not mine, but if I recall correctly, Mr. North did testify, I think towards the end of his direct examination, that in his opinion, based on his experience and his analysis of the plaintiff's situation and including his study and analysis of the cosmetics industry, he testified that in his opinion the accumulations by Duke Laboratories were not at all unreasonable.

"And if I further recall correctly, he said that that opinion—I think this was on cross-examination, although I am not sure—but I believe he stood on that conclusion that he believed, as a matter of opinion, that regardless of the so-called plans and projects of the company—in other words, he said just by looking at the liquid assets available and the needs of the company, or operating needs; that he could justify the accumulations in each of the years involved, without reference to the so-called plans and projects.

"Now, the reason I mention that is simply by way of an example of the care with which you must weigh, evaluate, and consider expert testimony.

"On the one hand, you have a witness who did state to you his qualifications, his experience, and I leave it to you as to what sort of an impression he formed in your minds.

"He testified with respect to his opinion as to a critical issue in the case. That opinion is not controverted. There is no contravening evidence or expert testimony to weigh against his.

"So in a sense, Mr. North's testimony, both with respect to that critical matter and others, is uncontroverted testimony. And you must be scrupulously careful in weighing that testimony, evaluating it, to bear in mind that neither Mr. North, in an expression of his opinion—nor Dr. Herzog, in his declaration that there was not an unreasonable accumulation nor was there any intent on the part of the corporation to avoid surtax on shareholders—by the same token, anything that I say to you in my charge to you ladies and gentlemen—you should be scrupulously careful not to let any of those things supplant or substitute for your sole and exclusive function and duty as judges of the facts, to determine what the facts are."

That is what I said to you yesterday on that subject, word for word.

As you recall, the latter part was given somewhat extemporaneously, and I think that this much clarification of the latter part of what I said to you is in order, and I, therefore, supplement what I just read to you, by the following:

No. 1. I would just like to make it crystal clear—I think I had said it, but so there will be no doubt about it—the expert testimony is not binding on the jury, and particularly Mr. North's statement of his opinion that the accumulations of earnings during the tax years involved did not exceed the reasonable needs of the business. That is an opinion. It is an opinion with respect to the ultimate issue, one of the ultimate issues that you ladies and gentlemen have to determine. So that it is not binding. It should be given such weight as you think it is entitled to.

No. 2. There was no contravening expert testimony to oppose Mr. North. That is, you cannot, on this record, weigh

Mr. North's expert opinion against the expert opinion of someone else .because that someone else was not called. So in that sense, the expert opinion expressed by Mr. North is not controverted. It is uncontroverted testimony. But, and I underscore this, you should weigh against Mr. North's opinion, all of the other evidence upon which the Government relies, even though they did not call an expert witness. The Government does dispute, obviously, the conclusion that Mr. North came to. They do dispute the accuracy of his opinion, and they challenge the reasons upon which his opinion was based. So that the Government does rely on evidence in the case, which should be considered by you in evaluating Mr. North's expression of opinion.

Just one further thing with respect to Mr. North's testimony. I told you what I thought it was. As you recall, I was quoting it from memory yesterday, both on direct examination and on cross-examination on this issue.

Now, I am going to read the brief extract that I had in my mind, so there will be no mistake about what his testimony was, and I do charge you that it is obvious what the record shows controls, and not my recollection of it. That applies to everything in the case, of course.

At the end of Mr. North's direct examination early in the afternoon of Tuesday of this week, when questioned by Mr. Cole, Mr. North, after stating the amount of accumulated earnings, that is, retained earnings by Duke during each of the years, four years involved, and stating the total of those figures, right after that, Mr. North was asked this question by Mr. Cole:

"Mr. North, on the basis of your experience and your studies, do you have an opinion whether Duke permitted earnings to accumulate during the period from 1956 to 1959, inclusive, beyond the reasonable needs of the business?

"A Yes, sir, I have an opinion.

"Q What is that opinion?

"A That the accumulation which took place was entirely reasonable."

And then he went on to state his reasons for that opinion which I am not going to read, because I did not attempt to summarize that yesterday. The record will note what I read a moment ago was at pages 401 and 402 of the transcript of May 21, 1963.

Then on cross-examination by Mr. Wilson on the same point, Mr. Wilson asked these questions, and Mr. North gave these answers. This cross-examination appears at page 414 of the transcript of the same day.

"Q Now, Mr. Cole asked you a question about whether or not the earnings were allowed to accumulate beyond the reasonable needs of the business, and you gave a long and involved answer. I am not certain that I understood it. Can you tell me succinctly the basis for your opinion, without going into as much detail as you did, in answer to Mr. Cole? On what did you base your opinion?

"A This corporation did not accumulate income unreasonably. So far, they not only did not have—they simply did not have enough money to do the job that was planned.

"Q Let me ask you this, Mr. North: You base your opinion on the assumption that these plans will be carried into effect; is that true?

"A Yes.

"Q You base your opinion as to the needs of the business on the plans which Mr. Herzog testified to?

"A Not entirely. Now, if you will refer to the very first year, that is, to 1956, at the close of 1955, that is, that was his kick-off; that was his opening day of business, in 1956, which was the first year, the tax year, under consideration. His cash on hand—I mean, cash and equivalent, was $1,678,000.

"Now, against that, he had—and these are your figures up there, $1,157,000. If we give him those figures which are on the blackboard, plus the $684,000 reserve, which was a four-month reserve for operating expenses, you come up with an actual deficit in terms of cash on hand, without taking into account at all the plans that he had for the plastic bandage business, the plans that he had for the third round of expansion at Norwalk, without taking into account any of these plans that are on the blackboard.

"Q Mr. North, if the corporation had no such plans, I assume your opinion would not be the same? Your opinion is based on the assumption that the corporation"—

Then the witness interrupted.

"A If the corporation had no such plans, my opinion would, I believe, be the same. If they had no plans for expansion.

"Q If the corporation had no plans, such as listed on the board?

"A Right."

Now, that, to the best of my ability, is the testimony on both direct and cross that I referred to in my charge to the jury yesterday. So, in the last analysis, give it such consideration as you think it is worth, depending partly upon the soundness of the reasons given for the opinion, your impression of the witness on the stand, based on his experience, studies, and so forth; but in the last analysis, it is for you to determine whether the accumulations were beyond the reasonable needs of the business and the expression of opinion by Mr. North is not binding on the jury.

**(2) Dr. Herzog's Conversations With Others Regarding Plans**

Now, coming to Question No. 2, which reads as follows:

"Is the jury to consider as legal evidence, conversation that Dr. Herzog had with others in regard to building and advertising plans schedules?"

Now, the short answer to that question, and I should behave here as a witness and answer these questions yes or no, or in as few words as possible, since I have been admonishing witnesses to do so for several years, but the short answer to that question is yes. That is, the jury should consider as legal evidence the conversation referred to. I think the answer to this question, if I may be permitted by you judges to explain my short answer a little bit, could be broken down into two categories: The question by its terms is whether the jury should consider as legal evidence these conversations. Any evidence which was admitted in this case, particularly Dr. Herzog's testimony of these conversations, is legal evidence, and as such, should be considered by the jury, together with all evidence in the case. In short, any questions that conceivably may be in the minds of the jury as to whether testimony of those conversations was hearsay or so-called self-serving declarations, all of that you can cast out of your minds. It is in evidence. It has been admitted. It is legal evidence, and it should be considered.

The second part of my explanation, if you will continue to permit me to expand my short answer, is, What do you do with that evidence? How do you treat it? I think probably that is what was back of this question. In other words, what weight do you give to it? How do you evaluate it within the framework of the charge that I gave you, and particularly that portion of the charge where I tried to summarize pretty much in a nutshell the requirements with respect to these plans? I think I said, in short, that you must find first a plan; if you find a plan, it must be coupled with action before you can give it any weight in determining whether these accumulations were beyond the reasonable needs of the business. I am going to read that short summary of that part of the charge to you, because it is the only place in the

charge, so far as I can recall, and can discover, by re-reading it last night, where I made any reference to these conversations that Doctor Herzog had. That portion of the charge, which I gave yesterday, I reaffirm as follows:

"In addition to having a definite plan, the corporation must couple this plan with some action taken towards its consummation. Remember these two simple terms; put perhaps as simply as possible, it will help, 'definite plan coupled with some action.'" In other words, plan plus action.

"Justification for the accumulation of funds cannot be found merely in subsequently declared intentions. The purpose, plan, or intention claimed must be manifested by some contemporaneous course of conduct directed towards the claimed objective.

"In short, in considering the plans referred to by Dr. Herzog during the course of his testimony, you should consider and ask yourselves in your deliberations, whether those plans were definite and, if definite, whether they were coupled with some action directed toward their accomplishment.

"As examples of action, action to be coupled with a definite plan, in the sense here used, you may consider, for example, evidence of expenditures incurred by the plaintiff to further these plans. You may consider evidence of correspondence and other communications, if there were any, between the plaintiff and others whose assistance was thought to be necessary to accomplish these plans. And as further examples of action implementing the plans, or coupled with the plans, you may consider inspections made by Dr. Herzog of plants and other facilities in this country and abroad. These are merely illustrations of evidence you may consider in determining whether the plaintiff's plans were coupled with action."

Now, one further word on the significance of, or weight which you may or may not wish to give to, Dr. Herzog's testimony of conversations he had with various people regarding these plans, and particularly the two that you mentioned in your question, that is, building and advertising plans and schedules. The law is, and Mr. Wilson is quite correct in his argument to the jury, that talk alone is not enough, either to constitute a plan, or to implement a plan. Talk and discussions, if nothing more, do not measure up to the standard required. But, as I tried to indicate in this charge, and I reassert it, these conversations that Dr. Herzog had, I think, with somebody named Bruns, or something like that, with an advertising agency, concerning the advertising plan or program of the company; conversations he had with other companies or representatives of other companies with respect to the manufacture of plastic bandage equipment; conversations he had with respect to the expansion of the buildings at Norwalk and Paterson, and so on down the line; those conversations are not necessarily, but they may be considered by you as, action—action in the sense that I have indicated to you. That action is required to be coupled with a plan before you may find that money accumulated to finance these plans was for the reasonable needs of the business.

Now, put as simply as I can, ladies and gentlemen, there are in the law many instances where we have what are so-called verbal acts. Now, these conversations, whatever weight you attribute to them is your function in the last analysis, but they may be considered, if you think they are, action in this sense of verbal acts implementing the plans.

You are all familiar with the fact that we have oral contracts which can be just as binding as written contracts.

In the law of defamation, the utterance of words of slander are just as actionable as written words which constitute libel.

What I am saying, in short, is that you cannot just read out of the case these conversations by putting a label on them as talk or discussions. The important

thing is to analyze what was said, the purpose of the conversations, the whole setting in which they were carried on, to the ultimate end of determining whether those so-called verbal acts were actions consistent with the company's claim that these accumulated earnings were needed for the reasonable needs of the company, or whether these earnings were accumulated with the intent of avoiding taxes, avoiding surtaxes, on the individual shareholders. That, of course, is the ultimate question, and as a result of, or as part of your deliberations, the yardstick or instrument by which you measure each of these items of evidence, including these conversations, is a yardstick which you should have calibrated to this rather finely balanced equation that you have got to resolve, and it is just as simple as this: In the last analysis, what was done with that money, the accumulations of roughly $300,000 for each of the four years involved? Were they accumulated for the purpose of satisfying the reasonable needs of the company, or were they accumulated for the purpose of avoiding the surtax which otherwise would be imposed on shareholders and principally on Dr. Herzog, as the largest shareholder, if those earnings had been paid out in dividends rather than accumulated?

The final note on which I am going to leave this is just a very short, succinct little statement by the late Judge Learned Hand, who is now deceased, but was for many years the Chief Judge of the Court of Appeals for this Circuit—the Court that declares the law that we follow. And in a case that involved the same issues as you have here—the facts were entirely different—Judge Hand, in one of the last opinions of his life, because it's a 1959 decision and he has been dead for about two years, he referred to the section of the statute which is one of the sections I read to you yesterday.[46]

He first pointed out that this statute declares that the earnings and the prof-

its of the corporation permitted to accumlate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. He is just quoting the statute. Then he says, "I believe that the statute meant to set up as a test of 'reasonable needs,' only the corporation's honest belief that the existing accumulation was no greater than was reasonably necessary."[47]

With that, ladies and gentlemen, I am going to leave the case to your further deliberations and I trust what I have said may be of some help to you. If you need further help, do not hesitate to let me know.

Thank you very much.

(The jury was excused at 10:50 a. m.)

* * *

**May 24, 1963 at 3:07 P.M.**

(In the absence of the jury, 3:07 P.M.)

THE COURT: About three o'clock the Court received the following message from the jury. I guess it was earlier than that because it is dated 2:45 p. m. It reads as follows:

"Your Honor, this jury is hopelessly deadlocked (unanimously) in deciding Question No. 1." It is signed Edward W. Blake, Foreman. I will hand this message to the clerk and ask that it be filed with this hour on it.

Gentlemen, as I indicated just before the noon recess, I do feel obliged at this juncture, and under these circumstances, to call the jury in and give them a supplemental instruction based on the Allen case. That is the case of Allen against the United States. I have no basis for believing that even the giving of that charge at this time will change the deadlock in the jury. But in the interests of both sides of this case, considerable

46. Casey v. Commissioner, 267 F.2d 26, 32 (2 Cir. 1959) (concurring opinion).

47. Ibid.

time and money having been invested in the preparation for the trial and the trial, but of even more paramount interest is the public interest in avoiding—if it is possible—a mistrial because of a hung jury, I feel it is my duty to give them this instruction.

Is there any objection on the part of counsel on either side, to the Court's doing so?

MR. COLE: No objection, your Honor.

MR. WILSON: I have not seen the Allen case, but I have no objection at this time, subject to anything I might want to raise after having had an opportunity to see the case. They didn't have the report in the United States Attorney's library.

THE COURT: An opportunity will be given to counsel in the absence of the jury to note any exceptions once the charge is given.

Bring the jury in.

(The jury entered the courtroom at 3:10 o'clock p. m.)

THE COURT: Good afternoon, ladies and gentlemen. The Court has received the message signed by your foreman, Mr. Blake, reading as follows:

"Your Honor, this jury is hopelessly deadlocked (unanimously) in deciding Question No. 1." It is signed by Edward W. Blake, the Foreman.

I believe that at this juncture the jury has been engaged in actual deliberations for a period of approximately seven hours. I may be a little off one way or the other, but the case was given to you yesterday at noon, just before lunch, 12:30 or so, and leaving out the various recesses for lunch yesterday and today, and the one overnight last night, I believe you were at it for a little less than four hours yesterday, and a little more than three hours today.

Now, at this point in your deliberations, and in view of the declaration by the jury through your foreman, that you are deadlocked, it is my duty under the law to give you a supplemental instruction which I will ask you to follow closely. I am sure you will appreciate the wisdom of it. I do not give this instruction unless or until I am satisfied that the jury is in just the position that you have indicated you are, namely, deadlocked. So I charge you further as follows: [48]

## SECOND SUPPLEMENTAL CHARGE

### (Based on *Allen* v. *United States*)

Ladies and gentlemen of the jury: The Court wishes to suggest a few thoughts which you may desire to consider in your deliberations, along with all the evidence and all the instructions previously given.

This is an important case. The trial has been expensive to both sides. If you should fail to agree on a verdict, or in this instance, upon answers to the two questions put to you, the case is left open and undecided. Like all cases, it must be disposed of sometime. There appears no reason to believe that another trial would not be equally expensive to both

---

48. The supplemental instruction to the jury, based upon Allen v. United States, 164 U.S. 492, 501–502, 17 S.Ct. 154, 41 L.Ed. 528 (1896), has been approved by the Second Circuit for use in *criminal* cases: United States v. Kahaner, 317 F. 2d 459 (2 Cir. 1963), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963); United States v. Tolub, 309 F.2d 286, 289 (2 Cir. 1962); United States v. Thomas, 282 F.2d 191, 195 (2 Cir. 1960). The use of the Allen charge has also been approved when applied to *civil* cases: John Fabick Tractor Co. v. Lizza & Sons, Inc., 298 F.2d 63, 65 (2 Cir. 1962); see Fredericks v. American Export Lines, 117 F.Supp. 255, 258 (S.D.N.Y.1953), aff'd, 227 F.2d 450 (2 Cir. 1955), cert. denied, 350 U.S. 989, 76 S.Ct. 475, 100 L.Ed. 855 (1956); see also Railway Express Agency v. Mackay, 181 F.2d 257, 262–263 (8 Cir. 1950).

sides. There is no reason to believe that the case can be tried again better or more exhaustively than it has been, on either side in this case to date. Any future jury must be selected in the manner and from the same source as you have been chosen. So there appears no reason to believe that the case would ever be submitted to twelve men and women more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence could be produced on behalf of either side.

Of course, these matters suggest themselves upon brief reflection to all of us who have sat through this trial, a period now of more than a week. The only reason they are mentioned is because some of them may conceivably have escaped your attention, which must have been fully occupied to this time in reviewing the evidence. They are matters which, along with other and perhaps more obvious ones, remind us how important and desirable it is that you unanimously agree upon answers to the special questions which have been submitted to you, if you can do so without violence to your individual judgment and conscience.

It is necessary to add that the Court does not wish any juror to surrender his or her conscientious convictions. Do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.

However, and we come now to the critical thing that I wish to say to you. It is your duty as jurors to consult with one another, and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but you should do so only after a consideration of the evidence with your fellow jurors. And in the course of your deliberations, you should not hesitate to change your opinion when convinced it is erroneous.

In order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor and frankness, and with proper deference to and regard for the opinions of each other. That is to say, in conferring together, each of you should pay attention and respect to the views of the others, and listen to each other's argument, with a disposition to re-examine your own views

If much the greater number of you are for answering Question No. 1 yes, each dissenting juror ought to consider whether his or her position that that question should be answered no, is a reasonable position, since it makes no effective impression upon the minds of so many equally honest, equally intelligent fellow jurors, who bear the same responsibility, serve under the sanction of the same oath, and have heard the same evidence with, we may assume, the same attention and an equal desire to arrive at the truth. On the other hand, if a majority or even a lesser number of you are in favor of answering Question No. 1 in the negative, that is, no, the other jurors ought seriously to ask themselves again whether the position they have taken is the correct one, which is not concurred in by many of their fellow jurors, and whether they should not distrust the weight or sufficiency of evidence which failed to convince the minds of several of their fellow jurors within the rules that I have laid down to you, with respect to the burden of proof and the necessity of proving these issues on the plaintiff's part, by a preponderance of the evidence.

You are not partisans. You are judges—judges of the facts. Your sole purpose is to ascertain the truth from the evidence before you. You are the sole and exclusive judges of the credibility of all the witnesses and of the weight and effect of all the evidence. In the performance of this high duty, you are at liberty to disregard all comments of both

Court and counsel, including, of course, the remarks I am making to you now.

Remember at all times that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of evidence. But remember also that, after full deliberations and consideration of all the evidence, it is your duty to agree upon a verdict, if you can do so without violating your individual judgment and your conscience.

You may conduct your deliberations as you choose, but I suggest that you now retire and carefully re-examine and reconsider all the evidence bearing upon the questions, particularly Question No. 1, which is the one you told me you are in disagreement on.

You may be as leisurely in your deliberations as the occasion requires; and you shall take all the time which you may feel is necessary.

You may now retire and continue your deliberations in such manner as shall be determined by your good and conscientious judgment, as reasonable men and women.

Now, ladies and gentlemen, just put in a nutshell, what I have said to you, perhaps it may be summarized bluntly and succinctly this way: You must obviously follow closely what I have said to you. This is the law. It is what I am required to say to you and I say so with the deepest conviction. We require in the Federal Court a unanimous verdict. That applies throughout the United States. That is not my requirement, but the requirement as specified. It is in our basic law. As some of you know, in certain State Courts in civil cases, verdicts may be returned by less than a unanimous vote of the jury. In New York, it is a 5–6 rule. It is either 10 out of 12 or 5 out of 6 jurors. In some states, three-quarters of the jurors in a civil case can resolve it. I am not saying that for the purpose of altering the rule which is followed in the Federal Court. But this being a civil case—aside from

the vital interests of the parties involved here, the Government on one side, and Duke Laboratories on the other—there is an even more paramount interest involved, and that is the public interest to bring to a conclusion a controversy of this sort as swiftly and expeditiously and with the minimum of expense as possible.

You can just imagine what it has cost to prepare this case for trial on the part of both sides; what it has cost to try the case during the week or more that we have been here; and to foresee another trial of this case, which we would be required under the law to do and do fairly promptly, places, at least in my judgment, a high degree of responsibility on my part to urge you with the utmost sincerity to take one more try at this case.

You must return your answers to these questions unanimously. I cannot change that rule. But what I am authorized to say to you within the framework of this supplemental instruction, is that if there is a majority of you—I realize you tell me you are unanimously deadlocked, and I am not going to probe behind that—but, it usually happens that you are not six to six, or even if you are, you should reconsider, but if there is a majority of you in favor of answering Question No. 1, one way or the other—what I am saying, in short, is, the dissenters, the minority, give another thought to it. You will not be violating your oath or violating your conscience if you reconsider the situation in the light of what I have just said.

And if the dissenters or the minority can conscientiously bring themselves to go along with the majority within the framework of what I have just said to you, you will be rendering a public service, and you will be performing your duty as jurors in accordance with your oath.

Having said what I have, please do not, any of you, or any one of you, misunderstand me. I am extraordinarily grateful to each of you for the time you

have put into this case, sitting during the receipt of evidence, and for having had the case under deliberation now for over twenty-four hours. All I am saying, in a nutshell, is, ladies and gentlemen, if it is possible to avoid a hung jury, I would like to have you give it one more try.

And from this point on, it is again solely within your control. You have been at it a long time. You obviously have been conscientious about it. There is not the slightest implication in what I said to the contrary. And if you go out and come back in five minutes and tell me you are still deadlocked, I will still thank you for the time you have put in. But if, on the other hand, you come back and tell me there is a fair chance that you can come to an agreement, both I and counsel on both sides will be extraordinarily grateful to you.

Please retire and give it your consideration. I will be here. Just let me know when you want to come in, and I will see you as soon as you are ready.

(The jury was excused at 3:23 p. m.)

(The jury returned to the courtroom at 4:08 p. m.)

THE COURT: Good afternoon again, ladies and gentlemen.

THE CLERK: Ladies and gentlemen of the jury, have you agreed upon the answers to the questions submitted to you by the Court?

THE FOREMAN: We have.

THE COURT: Will you hand them up, please?

THE CLERK: Ladies and gentlemen of the jury, kindly listen to your answers as received by the Court.

In Civil Action No. 9332, Duke Laboratories, Incorporated, versus the United States of America, Question No. 1 submitted, "Did plaintiff, Duke Laborato-

ries, Incorporated, permit its earnings or profits to accumulate beyond the reasonable needs of its business during the year 1956?"

The answer of the jury is yes; during the year 1957, the answer of the jury is yes; during 1958, the answer of the jury is yes; during 1959, the answer of the jury is yes.

Are these your answers, and so say you all?

(The jury answered in the affirmative.)

THE CLERK: The second question, "Were such accumulations, if any, made for the purpose of avoiding the surtax upon the stockholders of Duke Laboratories, Incorporated?"

During 1956, the answer of the jury is no; during 1957, the answer of the jury is no; during 1958, the answer of the jury is no; during 1959, the answer of the jury is no.

It is dated at New Haven, Connecticut, the 24th day of May, 1963, and signed Edward W. Blake, Foreman of the Jury.

Are these your answers, and so say you all?

THE FOREMAN: Yes.

THE COURT: Does counsel for either side wish the jury polled with respect to its answers to either or both of these questions?

MR. WILSON: We do not, your Honor.

MR. COLE: The plaintiff does not, your Honor.

THE COURT: The verdict of the jury in the form of its answers to the special questions submitted to the jury is accepted by the Court, and is ordered recorded.

APPENDIX

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DUKE LABORATORIES, INC.
 v. } Civil No. 9332
UNITED STATES OF AMERICA

SPECIAL QUESTIONS TO BE ANSWERED BY JURY

I

DID PLAINTIFF, DUKE LABORATORIES, INC., PERMIT ITS EARNINGS OR PROFITS TO ACCUMULATE BEYOND THE REASONABLE NEEDS OF ITS BUSINESS?

(a) During 1956 ................... √ / Yes No

(b) During 1957 ................... √ / Yes No

(c) During 1958 ................... √ / Yes No

(d) During 1959 ................... √ / Yes No

[Answer the above question, for each of the four tax years involved, either "Yes" or "No".]

II

[If your answer to the above question for any year or years is "Yes", then with respect to that year or years, answer the following question either "Yes" or "No".]

WERE SUCH ACCUMULATIONS, IF ANY, MADE FOR THE PURPOSE OF AVOIDING THE SURTAX UPON THE STOCKHOLDERS OF DUKE LABORATORIES, INC.?

(a) During 1956 ................... Yes √ / No

(b) During 1957 ................... Yes √ / No

(c) During 1958 ................... Yes √ / No

(d) During 1959 ................... Yes √ / No

Dated at New Haven, Connecticut, this 24th day of May, 1963.

Edward W. Blake

Signed: _____
 Foreman of the Jury